# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI
## CENTRAL DIVISION

| | |
|---|---|
| KIMBERLY SPRENGER on behalf of herself and all others similarly situated, Plaintiff, <br><br> v. <br><br> FCA US LLC <br> Defendant. | Case No.: __2:20-cv-4008__ <br><br> **CLASS ACTION COMPLAINT DEMAND FOR JURY TRIAL** |

## CLASS ACTION COMPLAINT

Plaintiff Kimberly Sprenger brings this action against Defendant FCA (Fiat Chrysler Automobiles) US LLC on behalf of herself and all others similarly situated. Plaintiff's allegations herein are based upon personal knowledge as to her own acts and experiences in this matter, the investigation of counsel, and upon information and belief as to all other matters.

## I. SUMMARY OF CASE

1. Historically, automobile sunroofs have been modestly sized, spanning just a small portion of the roof over the driver and front passenger seats.

2. Starting in the mid-2000s, automobile manufacturers expanded sunroofs in size so that now a sunroof (*i.e.*, sheet(s) of glass) accounts for nearly the entire roof of a vehicle. These expanded sunroofs are often referred to as "panoramic."

3. Panoramic sunroofs are aesthetically pleasing and command a premium price. They also pose new and significant engineering challenges. Replacing metal portions of automobile roofs with large plates of glass requires precision in the strengthening, attachment, and stabilization of the glass.

1

4.     FCA and other manufacturers failed to meet these engineering challenges, with at least three manufacturers issuing safety recalls due to the panoramic sunroofs' propensity to spontaneously shatter.

5.     The shattering events are so powerful that startled drivers compare it to the sound of a gunshot, after which glass fragments rain down upon the occupants of the vehicle, sometimes while driving at highway speeds.

6.     FCA does not warn current or potential drivers of the danger(s) associated with the panoramic sunroof feature.

7.     FCA continues to sell and lease its vehicles with this panoramic sunroof feature to consumers.

8.     FCA does not disclose any known or potential defect nor the known or potential danger(s) of the panoramic sunroof to current or potential FCA vehicle owners.

9.     FCA knew or should have known about this problem since at least 2015 due to a number of consumer complaints lodged with the National Highway and Transportation Administration ("NHTSA"), the NHTSA Kia investigation, recalls and industry happenings, warranty claims, dealer reports, and internal testing.

10.     FCA's conduct violates federal law as well as state consumer protection and warranty laws. Plaintiff, on behalf of herself and Class Members, seeks an award of damages and appropriate equitable relief, including an order enjoining FCA from continuing to sell vehicles with defective panoramic sunroofs and requiring FCA to disclose the defect to current owners of the Class Vehicles (defined below) and repair their vehicles with non-defective panoramic sunroofs.

2

## II.  PARTIES

11.    Plaintiff Kimberly Sprenger is a citizen and resident of Jefferson City, Cole County, Missouri.

12.    Defendant FCA US LLC is a Delaware limited liability company with its headquarters in Auburn Hills, Metro Detroit, Michigan.

13.    At all times relevant to this action, FCA designed, manufactured, marketed, distributed, and/or warranted the vehicles at issue in the State of Missouri and throughout the United States.

## III.  JURISDICTION AND VENUE

14.    United States District Court for the Western District of Missouri has original subject matter jurisdiction over this matter pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because the proposed Class exceeds one hundred members, the aggregate amount in controversy (excluding interest and costs) exceeds $5,000,000.00, and there is the requisite degree of diversity of citizenship between the parties.

15.    The United States District Court for the Western District of Missouri also has original subject matter jurisdiction over the Magnuson-Moss Warranty Act claim, 15 U.S.C. § 2301, pursuant to 28 U.S.C. § 1331.

16.    The United States District Court for the Western District of Missouri can exercise supplemental jurisdiction over the Class's state law claims under 28 U.S.C. § 1367.

17.    The United States District Court for the Western District of Missouri can exercise personal jurisdiction over FCA because it has regular and systematic contacts with the state of Missouri, in which it does business and places the Jeeps in the stream of commerce.

18.    The United States District Court for the Western District of Missouri is a proper venue for this action, pursuant to 28 U.S.C. § 1391(b)(1), because FCA is subject to personal jurisdiction in

3

this District, the sale of Plaintiff's Jeeps occurred in this District, and such sale gave rise to this action.

## IV.     SUBSTANTIVE ALLEGATIONS

### A.  The FCA Panoramic Sunroof Defect

19.     FCA designs, engineers, manufactures, markets, warrants, distributes, and sells mass produced automobiles in the United States under several brand names, including Chrysler, Dodge, Fiat, Ram, Maserati, and Jeep.

20.     The FCA automobile models that are the subject of this case include any Jeep vehicle model year 2015-present with a factory-installed panoramic sunroof purchased in Missouri or by a Missouri resident (collectively, the "Class Vehicles"), including Jeep Cherokee and Grand Cherokee.

21.     Starting in at least the 2014 model year, FCA introduced vehicles with a factory-installed panoramic sunroof into its Jeep line.

22.     At that time, panoramic sunroofs were still relatively new; these sunroofs are both wider and longer than traditional sunroofs, covering most of the vehicle's roof.

23.     FCA generally markets the Jeep panoramic sunroofs as a luxury upgrade.  See an example advertisement for the panoramic sunroof feature as part of the "enhancements" offered by FCA that "raise the bar" in its 2014 Jeep Grand Cherokee:

4



24.     FCA's advertising includes the panoramic feature among the "long list of premium standard features and available options [that] pamper, impress…like never before"[2]

25.     These premium standard features, like the panoramic sunroof, allow FCA to charge more for their vehicles.

26.     The actual material cost of the panoramic sunroofs is relatively low, making the option one of the most profitable features in the automotive industry.

27.     Panoramic sunroofs are made of tempered or laminated glass that attaches to tracks, which in turn are set within a frame attached to the vehicle.

28.     Most panoramic sunroofs, including those offered by FCA, include a retractable sunshade.

29.     The panoramic sunroofs in all of the Class Vehicles are substantially similar in design and manufacture. Examples of FCA's Jeep panoramic sunroofs appear in the photographs below:

        a. The 2014 Jeep Cherokee brochure calls for consumers to "[o]pt for CommandView, the new dual-pane full-length sunroof:"

---

[1] https://issuu.com/davesmithmotors/docs/2014jeepgrandcherokee?&mode=embed&viewMode=presentation&layout=http%3A//skin.issuu.com/v/light/layout.xml&backgroundColor=2f2f2f&showFlipBtn=true (last accessed 1/10/2020).

[2] *Id.*



It's more than a new way of looking at the world,
it can take you to a new world altogether.

Traveling to destinations with a confidence that only a Jeep, brand SUV can deliver, the 2014 Jeep Cherokee
connects you with award-winning Uconnect® technology and a fully luxurious interior,
available in a stunning world color palette inspired by Italy's Mount Vesuvius, for a look unlike any other.
Opt for CommandView® the new dual-pane full-length sunroof, and passengers
in all rows will get more from every adventure, anywhere they go.

[3]

b.   2015 Jeep Grand Cherokee

**SEATING IN FIRST CLASS**
All of Grand Cherokee Summit's first- and second-row
seats are heated for comfort in every climate, and front
seats are ventilated and power-adjustable eight ways,
with four-way lumbar adjustment.

**COMMANDVIEW® PANORAMIC SUNROOF**
This view from the top is revealing. There's more to be
seen when you look up and out via Grand Cherokee's
full-power sunroof with a power sunshade in front and
a fixed-glass window in the rear. One look at this
dual-paned sliding-glass ceiling and you'll definitely
enjoy seeing what comes naturally into view.



[4]

---

[3] https://issuu.com/davesmithmotors/docs/2014_jeep_cherokee?&mode=embed&viewMode=presentation&layout=http%3A//skin.issuu.com/v/light/layout.xml&backgroundColor=2f2f2f&showFlipBtn=true (last accessed 1/10/2020).
[4] https://issuu.com/davesmithmotors/docs/grand_cherokee_2015?e=7244781/9816005

c.  2015 Jeep Cherokee



d.  2016 Jeep Grand Cherokee



5 https://issuu.com/davesmithmotors/docs/cherokee_2015?&e=7244781/9802139

6 https://issuu.com/davesmithmotors/docs/ebrochure-jeep_grand_cherokee_2016

e.   2017 Jeep Grand Cherokee



f.   The 2018 Jeep Grand Cherokee also offers the CommandView Dual-pane

Panoramic Sunroof; the brochure notes that the feature is "[a]vailable."



7 https://issuu.com/davesmithmotors/docs/ebrochure_-_jeep_grand_cherokee_cat

8 https://issuu.com/davesmithmotors/docs/ebrochure_-_jeep_grand_cherokee__20 (last accessed 1/10/2020).

8

30. Panoramic sunroofs, like these, present manufacturing, design, and safety challenges for manufacturers because the large plates of glass take up much of the surface area of the vehicle's roof.

31. One of the challenges is the material make-up of the glass. Whereas some manufacturers, such as Volvo and Honda, have used a *laminated* glass, other manufacturers, like Nissan, Ford, Kia, Hyundai, and FCA, have opted to install panoramic sunroofs with *tempered* glass that features large areas of ceramic paint.

32. In the automotive industry, tempered or toughened glass is made generally in the same manner: a piece of annealed glass is shaped and cut as to original equipment manufacturing ("OEM") standards. The glass is heated and then rapidly cooled, *i.e.*, tempered. The tempering process creates an outer layer of compression shrink-wrapped around the middle of the glass that is constantly pressing outwards, otherwise known as causing tension or tensile force. The compressive and tensile layers create a stronger piece of glass as compared to non-tempered glazing. If the compressive layer is compromised, however, the entire piece of glass fails catastrophically, and often explosively.

33. The problems with panoramic sunroofs are compounded by automakers', including FCA's, use of thinner glass. FCA, as well as other manufacturers, use thinner glass in panoramic sunroofs to save weight and thus improve fuel efficiency because FCA, like other automobile manufacturers, are under mandates to improve fuel efficiency. Thinner glass, however, is very difficult to temper properly (especially when thicknesses are 4mm or less) as the compressive layers are thinner, increasing the probability for the glass to be compromised and result in catastrophic failure.

34.     Additionally, the tempered glass used in FCA sunroofs in the Class Vehicles features a ceramic paint applied prior to tempering. Automotive ceramic paint or ceramic enamels are composed of fine powders of low melting glass frit fluxes (ground glass), pigments, and other additive oxides, sulfides, or metals. After application of the ceramic enamel, the glass is then tempered, as described above. These ceramic enamels are applied on the top around the edges of panoramic sunroof glazing and serve aesthetic and functional purposes.

35.     Ceramic enamels are known "adulterants" in automotive glass tempering and these adulterants significantly weaken the structural strength and integrity of the Class Vehicles' tempered panoramic sunroof glazing. Among other factors, ceramic enamels compromise glass strength because: (1) the enamels have different thermal expansion coefficients than the glass substrates (the glass and the paint expand at different rates), resulting in residual stress between the ceramic enamel and the glass substrate and (2) the glass frit will ion exchange with the glass substrate lessening or eliminating the compressive layer above the tensile region thereby significantly weakening it.

36.     The ceramic paint area was relatively small in conventional sunroofs, but ceramic paint areas have become larger with the advent of panoramic sunroofs and the result is that the glass has become progressively weaker – more likely to spontaneously burst or explode – and, for the unsuspecting driver and passengers, more dangerous.

37.     In 2013, the Korea Automobile Testing & Research Institute ("KATRI"), a vehicle safety testing institute, concluded that the enamel used for ceramic paint areas in panoramic sunroofs like those installed in FCA vehicles impairs the strength of the glass, making the glass not only less durable than the usual toughened glass, but also less durable than ordinary glass.

38.     Following KATRI's report, an Informal Working Group on Panoramic Sunroof Glazing was established by the United Nations Economic Commission for Europe to evaluate the safety of panoramic sunroofs. The Working Group is chaired by a representative from KATRI and was assembled to assess whether to amend the UN regulations on safety glazing. At the end of June 2016, the Working Group confirmed that conventional automotive glass enamels weaken the mechanical strength of panoramic sunroof glazing.

39.     Another challenge presented by the panoramic sunroofs is the need to ensure the sunroof glass is fastened to the vehicle with a sufficient degree of tightness. FCA and other manufacturers seek to fasten the sunroof in a manner that reduces road and wind noise, as well as to make the sunroofs less susceptible to leaking rainwater. At the same time, the sunroof may be weakened with the application of pressure, as flexing and vibration caused during ordinary driving can impose stress and ultimately lead to shattering the glass.

40.     In the FCA Jeep models at issue, the compromised tempered glass cannot withstand the pressures and flexing that the sunroof frame and vehicle demand, even when the vehicle and sunroof are brand new. The consequence is that under ordinary driving conditions, and in some instances when the vehicle is parked or not otherwise in motion, the glass spontaneously shatters.

### B. Consumer Complaints Reveal the Magnitude of the Defect and FCA's Failure to Take Responsibility

41.     At least 41 Jeep vehicle owners reported an incident of their sunroof shattering to the NHTSA. A brief summary of consumer complaints appear below:

| Date of NHTSA Complaint | Date of Incident | Model Year | Jeep Model | NHTSA ID Number | NHTSA Consumer Complaint Excerpt |
|---|---|---|---|---|---|
| 12/14/2019 | 12/13/2019 | 2016 | Grand Cherokee | 11289027 | "I WAS DRIVING STRAIGHT ON THE HIGHWAY AT ABOUT 65 MPH ON 12/13/19 WHEN I HEARD AN EXPLOSION, AND SUDDENLY GLASS WAS |

| | | | | | |
|---|---|---|---|---|---|
| | | | | | RAINING DOWN ON ME….IT SEEMS MY SUNROOF EXPLODED ON IT'S OWN, FOR NO APPARENT REASON AND WITHOUT WARNING….THERE ARE GLASS SHARDS LITTERED THROUGHOUT THE CABIN OF MY VEHICLE." |
| 11/20/2019 | 11/19/2019 | 2014 | Grand Cherokee | 11281293 | "DRIVING DOWN THE INTERSTATE THE SUNROOF EXPLODED." |
| 11/01/2019 | 10/31/2019 | 2016 | Grand Cherokee | 11277465 | "SHATTERED SUNROOF WHILE GOING 70-75 MPH ON HIGHWAY" |
| 08/19/2019 | 08/19/2019 | 2019 | Grand Cherokee | 11244680 | "EXPLODING SUNROOF…THE DEALER WAS MADE AWARE OF THE FAILURE,BUT DENIED ANY RESPONSIBLITY." |
| 08/13/2019 | 08/13/2019 | 2017 | Grand Cherokee | 11243466 | "MY SUNROOF EXPLODED WHILE DRIVING ON HIGHWAY…. SOUNDED LIKE A TIRE BLEW AND BEFORE I KNEW IT GLASS WAS FALLING ALL OVER ME AND MY CAR." |
| 08/12/2019 | 08/8/2019 | 2015 | Grand Cherokee | 11243318 | "THE SINGLE PANE SUNROOF EXPLODED WHILE PARKED. GLASS SHATTERED EVERYWHERE..." |
| 08/06/2019 | 08/05/2019 | 2017 | Grand Cherokee | 11242008 | "WHILE DRIVING..., MY SUNROOF GLASS EXPLODED FOR NO APPARENT REASON….THE BROKEN GLASS ALL FLEW OUTSIDE BUT THE EXPLOSION WAS EXTREMELY LOUD AND COULD HAVE CAUSED INJURY TO MYSELF OR OTHER DRIVERS." |
| 06/18/2019 | 06/15/2019 | 2016 | Grand Cherokee | 11221065 | "…MY SUNROOF ON MY 2016 JEEP GRAND CHEROKEE EXPLODED AS I WAS EXITING A GARAGE. THE EXPLOSION SOUNDED LIKE A GUNSHOT AND I WAS SHOWERED WITH GLASS." |
| 05/20/2019 | 05/17/2019 | 2013 | Grand Cherokee | 11208573 | "…WHILE DRIVING AT APPROXIMATELY 20 MPH, WITHOUT BEING STRUCK BY DEBRIS OR A FOREIGN OBJECT THE SUNROOF EXPLODED AND THE VEHICLE SHOOK." |

| 05/13/2019 | 05/13/2019 | 2018 | Grand Cherokee | 11207322 | "EXPLODING SUNROOF WHILE DRIVING" |
|---|---|---|---|---|---|
| 05/11/2019 | 05/10/2019 | 2017 | Grand Cherokee | 11206945 | "I WAS DRIVING ALONG A RURAL HIGHWAY @ 65 MPH & HEARD A LOUD EXPLOSION ABOVE MY HEAD. IT SOUNDED LIKE A GUNSHOT. I ACTUALLY DUCKED DOWN IN MY SEAT LOOKING INTO MY REAR & SIDEVIEW MIRRORS. THERE WAS NO ONE AROUND ME. IT WAS PARTLY CLOUDY & 60 DEGREES….I DECIDED TO STOP & CHECK THINGS OUT. LOOKING ON TOP OF THE ROOF I NOTICED A LARGE HOLE IN THE SUNROOF W/BROKEN GLASS LYING ON THE SHADE GUARD….[THE LOCAL DEALERSHIP] DIDN'T SEEM TO BE TOO CONCERNED W/MY SAFETY EITHER! ACCORDING TO CONSUMER REPORTS.ORG THE ISSUE IS WELL KNOWN WITHIN THE AUTO INDUSTRY & GOVERNMENT REGULATORS. ACCORDING TO INVESTIGATIONS AUTO MAKERS ARE NOT ACKNOWLEDGING OR MAKING AN ATTEMPT TO RESOLVING THIS ISSUE. SAFETY STANDARDS & REGULATORY OVERSIGHT OF SUNROOFS HAVE NOT KEPT PACE W/DRAMATIC SIZE & DESIGN CHANGES. MORE NEEDS TO BE DONE TO GUARANTEE THEY ARE SAFE. THE BIGGER THE EXPANSE OF GLASS, THE HARDER TO ENSURE IT WON'T SHATTER….THE VEHICLE/GLASS IS JUST TWO YEARS OLD. I HAD NO IDEA THERE WERE ANY ISSUES W/SUNROOFS SHATTERING. I WOULDN'T PURPOSELY JEOPARDIZE MY SAFETY NOR THAT OF MY PASSENGERS. THERE NEEDS TO BE A GREATER |

| | | | | | |
|---|---|---|---|---|---|
| | | | | | PUBLIC AWARENESS. TRANSPARENCY PLEASE" |
| 01/24/2019 | 01/23/2019 | 2019 | Grand Cherokee | 11171914 | "…FRONT GLASS PANEL OF PANORAMIC SUNROOF EXPLODED WHILE DRIVING ON THE FREEWAY….I WENT DIRECTLY TO THE DEALER WHO FELT ANROCK CAUSED THIS AND COULD NOT AND WOULD NOT HELP ME AND SAID HE'D NEVER HEARD OF THAT. THEY DID NOT EVEN LOG MY VISIT TO THEIR SERVICE DEPARTMENT. I CONTACTED CHRYSLER WHO SAID THEY WILL [NOT] DO ANYTHING SINCE THE SERVICE TECH AT DEALER LOOKED AT AND SAW NO DEFECT TO THE FRAME….I AM REPORTING THIS AS OTHERS MAY BE REFUSED BY THE DEALER AS I WAS AND IT NOT BE INVESTIGATED OR IGNORED." |
| 12/29/2018 | 12/28/2018 | 2016 | Grand Cherokee | 11163906 | "MY SUNROOF EXPLODED WHILE DRIVING ON THE HIGHWAY." |
| 09/10/2018 | 08/06/2018 | 2018 | Grand Cherokee | 11128601 | "…SUNROOF SUDDENLY EXPLODED WHILE DRIVING 60 MPH ON THE FREEWAY DURING A HOT SUMMER DAY. I HEARD AN INITIAL LOUD CRACK SOUND AND MOMENTS LATER THE FRONT SUNROOF GLASS SHATTERED OUTWARD….THE GLASS SHOWERED INTO MY VEHICLE AND OVER MY HEAD….THERE WAS MILLIONS OF GLASS SHARDS AND FRAGMENTS ALL OVER THE INSIDE OF MY CAR AND THROUGHOUT THE CEILING. THIS VEHICLE ONLY HAS ~6500 MILES ON IT AND WAS PURCHASED IN MARCH 2018 BRAND NEW….VERY SCARY….I'M VERY DISAPPOINTED AND FRUSTRATED TO SAY THE LEAST AND THE SAGA CONTINUES." |

| 08/29/2018 | 08/29/2018 | 2018 | Grand Cherokee | 11123336 | "PANORAMIC SUNROOF EXPLODED OUTWARD - AT 5:15 AM, I WAS JUST STARTING TO GET ON THE ON RAMP TO THE FREEWAY….AS I WAS DRIVING ON THE ONRAMP I HEARD A LOUD EXPLOSION THAT FREAKED ME OUT SO BAD I WAS THANKFUL I DID NOT CRASH….I PULLED TO THE SIDE OF THE FREEWAY IN THE DARK AND GRADUALLY OPENED UP THE BARRIER TO THE SUN ROOF A LITTLE. I COULD SEE THAT ALMOST THE ENTIRE PANE OF THE BACK PART OF THE PANORAMIC SUNROOF HAD SHATTERED MAKING A HUGE GAPING HOLE….THIS IS A MANUFACTURER DEFECT THAT COULD HAVE CAUSED AN ACCIDENT OR WORSE IF THE BARRIER HAD BEEN OPEN AND THE GLASS HAD SHATTERED ON ME….THE EXPLOSION WAS VERY LOUD AND EAR PIERCING." |
|---|---|---|---|---|---|
| 07/19/2018 | 07/18/2018 | 2016 | Cherokee | 11112357 | "THE PANORAMIC SUNROOF EXPLODED WHILE DRIVING DOWN THE HIGHWAY, OUT OF NO WHERE….AFTER DOING SOME RESEARCH ONLINE THIS HAS HAPPENED TO SEVERAL OTHER BUYERS." |
| 05/09/2018 | 05/09/2018 | 2018 | Grand Cherokee | 11092676 | "I WAS DRIVING ON THE HIGHWAY…AND MY SUNROOF FAILED BY SHATTERING FOR AN UNKNOWN REASON AND GLASS FELL FROM TOP TO THE FLOOR. HAVE MINOR CUT…." |
| 05/01/2018 | 05/01/2018 | 2016 | Cherokee | 11091199 | "I CAME OUT OF MY DRIVE WAY AND STARTED DOWN THE ROAD (35MPH) AND ALL OF A SUDDEN WITHOUT ANY INDICATION MY PANORAMIC SUNROOF EXPLODED AND SHATTERED ALL OVER THE CAR." |
| 03/12/2018 | 03/08/2018 | 2015 | Grand Cherokee | 11078614 | "DRIVING ON HIGHWAY AT 60MPH, SUNROOF EXPLODES WITHOUT WARNING." |

| | | | | | |
|---|---|---|---|---|---|
| 02/06/2018 | 02/06/2018 | 2016 | Grand Cherokee | 11067189 | "…FRONT RETRACTABLE PORTION OF PANORAMIC SUNROOF SHATTERED AND DROPPED GLASS INTO THE PASSENGER COMPARTMENT ONTO THE DRIVERS HEAD…" |
| 11/12/2017 | 11/11/2017 | 2014 | Grand Cherokee | 11045435 | "THE SUNROOF TEMPERED GLASS SPONTANEOUSLY EXPLODED SHATTERING GLASS DOWN ON THE DRIVER WHILE DRIVING ON A THE FREEWAY AT 65 MPH….DRIVER WAS IN SHOCK AND ALMOST CRASHED. CAR INTERIOR IS FILLED WITH GLASS." |
| 11/10/2017 | 11/09/2017 | 2014 | Grand Cherokee | 11045139 | "THE SUNROOF…SPONTANEOUSLY EXPLODED AS I WAS DRIVING 70MPH ON INTERSTATE 5…THE EXPLOSION SOUNDED LIKE A GUNSHOT BLAST IN MY EAR. IT WAS VERY SCARY AND EXTREMELY DANGEROUS. THERE WAS ABSOLUTELY NO WARNING, NO CRACKS, NO LEAKS….THE GLASS EXPLODED UP AND OUT…. DEFINITELY, THE MOST FRIGHTENING EXPERIENCE I HAVE EVER HAD WHILE DRIVING." |
| 10/7/2016 | 7/20/2016 | 2008 | Liberty | 10914504 | "WHILE DRIVING APPROXIMATELY 55 MPH, THE SUN ROOF SUDDENLY OPENED AND COLLAPSED IN HALF…THE VEHICLE WAS TAKEN TO HUVAER CHRYSLER/JEEP/DODGE IN RICHMOND, MICHIGAN WHERE IT WAS DIAGNOSED THAT THE VEHICLE NEEDED A NEW SUN ROOF, WHICH WAS NOT COVERED UNDER WARRANTY. THE VEHICLE WAS NOT REPAIRED. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE." |
| 09/13/2017 | 08/25/2017 | 2014 | Grand Cherokee | 11023016 | "MY SUNROOF SPONTANEOUSLY AND WITHOUT CAUSE EXPLODED WHILE DRIVING AT 65MPH. ON |

| | | | | | |
|---|---|---|---|---|---|
| | | | | | THE INTERSTATE. THERE WAS NO WARNING AND THERE WERE NO HAZARDS ANYWHERE AROUND." |
| 08/03/2017 | 07/06/2017 | 2011 | Grand Cherokee | 11012706 | "I WAS DRIVING AND HEARD WHAT ALMOST SOUNDED LIKE AN EXPLOSION. I PULLED OFF THE ROAD AND REALIZED MY SUNROOF HAD EXPLODED….I AM CONCERNED FOR THE SAFETY OF OTHER JEEP OWNERS AND OTHER VEHICLES ON THE ROAD." |
| 07/26/2017 | 07/25/2017 | 2017 | Grand Cherokee | 11010848 | "BRAND NEW JEEP GRAND CHEROKEE WITH LESS THAN 500 MILES, ON A CLEAR DAY WHILE DRIVING APPROXIMATELY 50 MILES PER HOUR, THE FRONT PORTION OF PANORAMIC SUNROOF SPONTANEOUSLY SHATTERED. SOUNDED LIKE A GUNSHOT. TO ADD INSULT TO INJURY, CAR MANUFACTURER CLAIMS THEY ARE NOT LIABLE UNDER WARRANTY BECAUSE I CANNOT PROVE THE GLASS AND/OR DESIGN WERE DEFECTIVE. THE MANUFACTURERS NEED TO STOP MAKING PANORAMIC ROOFS OR ELSE COVER THEM UNDER THE WARRANTY." |
| 06/20/2017 | 03/24/2017 | 2010 | Liberty | 11000182 | "…1 MONTH AFTER I PURCHASED THE VEHICLE THE SUNROOF BROKE AND THE DEALERSHIP I PURCHASED THE VEHICLE FROM AND THE COMPANY I PURCHASED WILL NOT COVER IT AS WELL" |
| 06/18/2017 | 06/17/2017 | 2017 | Cherokee | 10995781 | "SUDDEN SHATTERED SUNROOF" |
| 03/21/2017 | 03/20/2017 | 2016 | Cherokee | 10967408 | "DRIVING 40MPH…WHEN A LOAD EXPLOSION OCCURRED. I LOOKED ALL AROUND THE VEHICLE SAW SOME GLASS, LOOKED UP AND SUNROOF COMPLETELY SHATTERED…I BOUGHT THIS CAR IN OCT. '16 AND HAVE HAD NOTHING BUT PROBLEMS WITH THE ROOF. |

| | | | | | |
|---|---|---|---|---|---|
| | | | | | FIRST IT RATTLED THEY CHANGED THE FRAME, NOW GLASS SHATTERED AND THE DEALER IS CHARGING MY INSURANCE TO FIX.POORLY MADE CAR." |
| 03/17/2017 | 03/17/2017 | 2014 | Grand Cherokee | 10966580 | "MY SUNROOF EXPLODED TODAY….I HEARD AND EXPLOSIVE NOISE DIRECTLY OVERHEAD. THERE WAS IMMEDIATE LOUD WIND NOISE ABOVE MY HEAD. I PULLED OVER AND OPENED THE SUNSHADE. THE SUNROOF WAS SHATTERED AND THE ENTIRE CENTRAL PORTION WAS GONE. ALL OF THE SHATTERED GLASS AROUND THE EDGES WAS CONVEX, BOWED OUTWARD AWAY FROM THE CAR." |
| 11/23/2016 | 11/23/2016 | 2015 | Grand Cherokee | 10927736 | "…WHILE DRIVING ON THE STRAIGHT HIGHWAY 60 MILES AN HOUR THE SUNROOF JUST EXPLODED AND SHATTERED, A LOT OF GLASS FELL ON TOP OF OUR CLOTHES AND INSIDE THE CAR. IT COMPLETELY SWERVED THE CAR.…" |
| 11/15/2016 | 11/10/2016 | 2014 | Cherokee | 10926171 | "I WAS DRIVING DOWN HIGHWAY…WHEN MY PANORAMIC SUNROOF EXPLODED. IT RAINED GLASS THROUGHOUT THE INTERIOR OF MY VEHICLE HITTING MYSELF AND MY 6 YEAR OLD IN THE BACK SEAT….MY FIANCE WAS FOLLOWING ME AND GLASS SPRAYED HIS CAR AS WELL." |
| 10/04/2016 | 09/27/2016 | 2016 | Grand Cherokee | 10913652 | "I ENTERED MY CAR , I DID HEAR A BOTTLE BREAKING NOISE BUT WASN'T SURE WHAT IT WAS….I OPENED THE SHADE AND SAW A HOLE AND SHATTERED GLASS." |
| 07/26/2016 | 07/24/2016 | 2015 | Cherokee | 10888851 | "DRIVING…WHEN SUNROOF GLASS EXPLODED, SOUNDING LIKE A SHOT GUN GOING OFF INSIDE THE CAR. GLASS CAME DOWN ALLL OVER THE |

| | | | | | |
|---|---|---|---|---|---|
| | | | | | PASSENGER COMPARTMENT. SUNROOF IS VISIBLY PUSHED UP AND OUT OF THE ROOF WITH NO IMPACTS FROM EXTERIOR. DEALER IS TELLING ME THIS IS NOT COVERED UNDER THE FACTORY WARRANTY DESPITE THE FACT THAT THERE WAS NO EXTERNAL FORCE WHICH CAUSED THE DAMAGE. THEY SAY THAT PRESSURE CAN BUILD UP INSIDE THE CAR WHEN THE A/C IS RUNNING AND THIS CAN SOMETIMES HAPPEN, WHICH SEEMS INDICATIVE OF A KNOWN ISSUE. I LOOKED ALL THROUGH THE OWNER'S MANUAL AND FIND NO REFERENCE TO THE POSSIBILITY THIS COULD OCCUR WITH NORMAL USE OF THE A/C." |
| 06/19/2016 | 06/19/2016 | 2014 | Grand Cherokee | 10875086 | "…MY SUNROOF…EXPLODED. THE GLASS SHATTERED AFTER MAKING WHAT SOUNDED LIKE A HAND GUN GOING OFF NEXT TO ME." |
| 09/07/2015 | 09/04/2015 | 2014 | Cherokee | 10762002 | "I WAS DRIVING DOWN THE HIGHWAY. WHEN I HEARD A LOUD GUNSHOT NOISE AND GLASS EVERYWHERE. I LOOKED UP AND NOTICED IT WAS MY SUNROOF…. MY TRUCK IS NOW IN JEEP BEING INVESTIGATED BUY JEEP TO SEE IF IT'S SOMETHING THAT THEY ARE RESPONSIBLE FOR WHICH THEY ARE. BUT I KNOW THEY ARE GOING TO TRY AND PUT IT ON MY INSURANCE AND THEN WE ARE GOING TO HAVE BIG PROBLEMS." |
| 09/02/2015 | 09/01/2015 | 2015 | Grand Cherokee | 10761099 | "DRIVING DOWN THE HIGHWAY NO OBSTACLES OR ANYTHING AROUND US AND THE SUNROOF EXPLODED. IT SOUNDED LIKE A GUNSHOT. PIECES OF GLASS STARTED FALLING DOWN ON MY WIFE AND I. WE DROVE IT STRAIGHT TO THE DEALER." |

| 08/27/2015 | 01/12/2015 | 2015 | Cherokee | 10759695 | "…MY SUNROOF EXPLODED FROM THE INSIDE OUT WHILE DRIVING ON THE HIGHWAY AND JEEP IS REFUSING TO COVER IT UNDER WARRANTY EVEN THOUGH NOTHING HIT THE VEHICLE AND THERE ARE OTHER REPORTS ONLINE OF THIS HAPPENING." |
|------------|------------|------|----------|----------|---|
| 08/13/2015 | 05/15/2015 | 2012 | Grand Cherokee | 10748453 | "I WAS DRIVING ON THE HIGHWAY AND MY SUNROOF SHATTERED." |
| 08/12/2015 | 08/10/2015 | 2015 | Grand Cherokee | 10748271 | "SUNROOF SHATTERED WHILE DRIVING DOWN HIGHWAY…. SOUND OF LARGE CRACK THEN IT SHATTERED. TOOK IT TO CERTIFIED JEEP SERVICE PROVIDER (ANCIRA JEEP, SAN ANTONIO, TX) AND PAUL, THE SERVICE MANAGER, SAID HE HAD NEVER SEEN ANYTHING LIKE THIS AND SOMETHING MUST HAVE HIT IT. THERE'S NO WAY IT WOULD HAVE JUST EXPLODED. NOTHING HIT IT - IT SHATTERED DUE TO EXCESSIVE HEAT. I HAVE CALLED JEEP, WHO SAYS THEY MUST STAND BEHIND THE RECOMMENDATION OF THE DEALER AND IT IS NOT A SAFETY ISSUE OR FAULTY PRODUCT ISSUE. IT IS MY RESPONSIBILITY TO FIX." |
| 08/01/2015 | 06/06/2015 | 2015 | Cherokee | 10745578 | "WE WERE DRIVING DOWN INTERSTATE, GOING SPEED LIMIT OF 70 MPH, WHEN ALL OF SUDDEN HEARD A LOUD POP, SOUNDED MUCH LIKE GUNSHOT….FOUND THE SUNROOF COMPLETELY SHATTERED. WHEN WE CALLED DEALERSHIP WAS TOLD WE WOULD HAVE TO CLAIM ON OUR INSURANCE. CHRYSLER DEALERSHIP SAID WASN'T THEIR FAULT, AND SINCE IT WAS NOT WINDSHIELD HAD TO FILE AGAINST INSURANCE CLAIM AS ACCIDENT. EVEN THOUGH DEALERSHIP COULD |

| | | | | | NOT FIND ANYTHING THAT HAD IMPACTED THE GLASS IN SUNROOF CAVITY, NOTHING BUT GLASS. SERVICE MANAGER STATED " MAYBE A BALL OR PINE CONE HIT IT" I ASKED GOING DOWN INTERSTATE AT 70 MPH? THEY REFUSED TO EVEN INVESTIGATE. SO I HAD TO FILE A CLAIM AGAINST INSURANCE AND PAY MY DEDUCTIBLE. SERIOUSLY THE SUNROOF JUST SHATTERED. GLASS WENT EVERYWHERE. HAD TO REPLACE THE INTERIOR OF THE SUNROOF ALSO!" |
|---|---|---|---|---|---|

(https://www-odi.nhtsa.dot.gov/owners/SearchResults; *las accessed 1/10/2020*).[9]

42.     "What's clear is that the consumer complaints in NHTSA's database are only a fraction of the actual sunroof explosions occurring in the U.S."[10]

43.     Consumer Reports describes the spontaneously shattering sunroofs "an underreported issue."[11]

44.     The NHTSA consumer complaints also demonstrate that FCA, as the manufacturer and through its authorized dealers, routinely fails to take responsibility, fulfill its warranty obligations, or acknowledge the defective nature of its panoramic sunroofs.

45.     On top of that, FCA, as the manufacturer and through its authorized dealers, often blames debris or the consumer for the spontaneous shattering of the sunroof.

46.     Rocks or other objects thrown up by cars and trucks on the roadway would not impact the sunroof with sufficient force to cause it to shatter, let alone to shatter *outward*, a fact that appears in many consumer complaints and of which FCA is aware.  Driver reports specifically contradict

---

[9] The searches yielding these results can be replicated by accessing the cited website address, selecting "Keyword (Complaints Only)," entering the word "sunroof" in the available text box, selecting 2015 from the "Start" dropdown box, selecting 2020 from the "End" dropdown box, selecting Jeep from the "Make" dropdown box, and then depressing the "GO" button.

[10] https://www.consumerreports.org/car-safety/exploding-sunroofs-danger-overhead/ (last accessed 1/10/2020).

[11] *Id.*

FCA's position. Significantly, some FCA panoramic sunroofs have spontaneously shattered while the vehicle was parked.

47.     Nearly all of the NHTSA complaints, in full text, deny that there was any debris, rock, or external object that came into contact with their sunroof.

48.     Consumers also made complaints or shared their shattering sunroof Class Vehicle stories online in places other than NHTSA. Examples include the following:

    a. Jeep Liberty shattered in June 2009


**08jeepliberty** Posts: 2
June 2009

I purchased my Jeep Liberty in April of 2008 and have genuinely been pleased with both the vehicle and the service. On June 24 my wife and I, while on vacation, were driving down I-10 in southern Mississippi and were suddenly frighten by what sounded like a shotgun blast just above our heads. We looked around and there were no other vehicles or overpasses in sight. We pulled over on the shoulder of the road to do an inspection of our Liberty and found that the sunroof had apparently exploded! The glass had shattered into thousands of small pieces from the exact center of the sunroof and the remaining glass fragments in the sunroof were bent outward as if the force of the explosion was from within the vehicle. South Mississippi was under an extreme heat warning at the time, and the outside temperature reading, as read on the vehicle display, was 102 F. After inspecting the outside of the vehicle, we could not find evidence of any other damage. We immediately called the service department of our dealer to report the incident and see what we should do about this. The service manager told us he had never heard of a sunroof exploding and suggested we make an insurance claim to repair the damage. I, however, feel that the explosion was the result of a defective glass which exploded when there was a huge difference in temperatures inside and outside of the car. Since it was unlikely that we could get the vehicle repaired quickly, and we didn&#146;t want to lose the money we had prepaid for a 4-day stay at the beachside condo in Alabama, we decided to do a temporary fix on the sunroof with some gray duct tape, being careful not to get any of the tape on the painted surface on the roof. It&#146;s now Monday morning (June 29) and we have returned home. I decided to get on the computer and investigate if there were any other reports of exploding sunroofs, and found the reports recorded on this site.
I am now trying to decide if I should file an insurance claim as if the damage was from a rock that struck the roof, or insist it was the result of a defective glass. I feel strongly that the incident resulted from a defect rather than a rock, since there were no overpasses or other vehicles anywhere near us when it happened, and the unlikelihood that a rock would strike the exact center of the sunroof with no surrounding damage of any type. One of my other concerns is that some of the glass fragments that fell between the roof and the interior lining of the vehicle must be removed or they will make noise or cause other problems in the future. Any advice on this matter would be greatly appreciated.



**08jeepliberty** Posts: **2**
July 2009

Just a follow-up on the 2008 Jeep Liberty exploding sunroof. The dealer has refused to fix the sunroof under warranty; or in other words, they claim no responsibility for having to replacing the sunroof. In fact, the service manager told me that the decision was made by a regional service manager in Atlanta. When I asked for a means to contact this person, she told me that she could not give out any information about this person. She told me I should bring it to a glass shop and file an insurance claim for the repair. When I asked her &#147;are you refusing service on my vehicle&#148; the service manager then backed off and said she would get back with me on the matter. She never retuned my call, although she claimed to have left several messages, none of which I received. Oh wellso much for good service! I&#146;m interested if BMW will agree to fix your car under warranty. Judging from some of the previous reports on this topic, they should. But this is probably the difference between a quality manufacturer (like BMW) and a bankrupt manufacturer like Chrysler. [12]

    b. The below example demonstrates that FCA, as the manufacturer and through its authorized dealers, blamed its consumers and failure to fulfill its warranty obligations:



**bhertz300** Posts: **1**
November 2013

Friday Nov. 8 I was going to a fast food drive through, my vent was opened so I decided to close it and the entire glass shattered! I thought how strange so I made a comment to the people at the drive up window, and they looked and made some comments. I decided to close the visor! I called the dealership and they had an opening on Tuesday the 12th I said OK and hung up. It was OK until I got out of the car and shut the door, then the middle of the glass fell into the car and onto the visor ( thank god I closed it)! I called the dealership back and he told me to drop it off tomorrow and they would give me a car to use. The asst. mgr called me on Monday the 11 and asked what happened and I told him. The next day the asst. mgr called me back and said that they found a problem, it was a piece of paper that I wrote directions on 2 weeks prior that I use to put an address into the GPS. I was like what, a piece of paper?? So my questions started, and then I decided to go to the dealership to have them show me how the paper was. I didn't want to call them a liar, I did everything but. I told them I do not see how a piece of paper that was in the cubby in front of the shift level: flew up, past my head, folded up into a little square, got stuck in the closing mechanism for the vent and shattered the glass. I told them that that piece of paper was only folder in half once and then again in half, put into my pocket to program the GPS in the car. I said there is no way that piece of paper flew past my head at some point, folded 2 more times (basically the paper was folded in 16ths when they showed it to me / 1.5 inch by 1.5 inch) and got stuck in the mechanism, nor my wife or I ever saw it lodged when we looked up and it wasn't showing from outside of the car. No friggin way!! I told them again that I only folder that piece of paper twice, not 4 times, and I didn't see how it folder 2 more time in the mechanism! My feeling is for some reason Chrysler doesn't want to cover it and took that piece of paper folder it 2 more times and show it to me. There is NO logic to me that that could ever happen the way they explained it, and me or my wife never seeing the paper when we looked up. It has been cold in the Northeast so the windows have not been open in the car just the vent on occasions. This makes NO sense at all! I feel the glass was defective, but I cannot understand why when my car is under warranty they do not want to cover it! Absolutely ridiculous!! [13]

---

12 https://forums.edmunds.com/discussion/7429/lexus/sts/exploding-sunroofs (last accessed 1/10/2020).

13 https://forums.edmunds.com/discussion/7429/lexus/sts/exploding-sunroofs/p3 (last accessed 1/10/2020).

c. Some consumers took to Facebook:





## C. FCA's Knowledge of the Defect

49.　FCA has long known that its panoramic sunroofs are prone to unexpected and dangerous shattering.

50.　Like other automobile manufacturers, FCA monitors the NHTSA website for emerging problems with its vehicles.

51.　The NHTSA brings awareness to the issues and danger associated with shattering sunroofs through complaints and investigations.

24

52.    NHTSA complaints concerning FCA's shattering panoramic sunroofs have been lodged since as early as 2015.  Since the initial 2008 complaint, another 40 complaints have been logged on the NHTSA website concerning this issue.

53.    On May 14, 2014 NHTSA opened an investigation into spontaneously shattering panoramic sunroofs.  (http://www-odi.nhtsa.dot.gov/owners/SearchSafetyIssues,  NHTSA Investigation ID Number:  EA 14002; *last accessed 1/10/2020*).

54.    Throughout the investigation, NHTSA has requested information on panoramic sunroofs offered in the industry from 13 manufacturers. Only 5 responses are posted publicly on the NHTSA website, but even those contain missing or redacted information.[14]

55.    In addition to monitoring the NHTSA website for complaints and investigation updates, FCA internally tracks information regarding the panoramic sunroof failures through the collection of incident reports and other information from drivers and dealers (as evident from the NHTSA complaints detailing communication and reporting by consumers directly to FCA or its authorized dealers), including complaints, warranty claims, replacement parts data, dealings with insurance, and other aggregated data sources. FCA has nearly exclusive access to this information, including pre-release testing of vehicle components, so it is implausible that FCA had no knowledge very early on about the defect.

56.    FCA is also aware that other manufacturers—whose vehicles have similarly designed panoramic sunroofs and similar shattering problems—have voluntarily initiated safety recalls to notify drivers of the danger and repair shattered sunroofs free of cost.

57.    FCA has done nothing regarding this predominant problem relating to its defective panoramic sunroofs shattering.

---

[14] https://www.consumerreports.org/car-safety/exploding-sunroofs-danger-overhead/ (last accessed 1/10/2020).

25

### D. The Dangers Posed to Class Vehicle Occupants

58.    NHTSA, KATRI, and responsible automobile manufacturers have acknowledged that the spontaneous failure of panoramic sunroofs endangers drivers, passengers, and others on the road.

59.    Panoramic sunroofs are an expensive upgrade option that can cost thousands of dollars in the purchase or lease price and over a thousand dollars to replace.

60.    A reasonable person considering whether to purchase or lease a Class Vehicle would want to be informed about the panoramic sunroof defect so that he or she could opt against paying the thousands of dollars for a "luxury upgrade" or simply forego purchasing or leasing the vehicle altogether.

61.    When the Class Vehicle panoramic sunroofs shatter, they usually make a sudden and extremely loud noise, followed by shards of glass raining down onto the driver and passengers. Drivers report that the falling shards of glass have cut them and their passengers and have also caused damage to the interior of the vehicles. Drivers have also reported a number of near-miss accidents that occurred after they were startled or distracted by the shattering. Both FCA and the NHTSA have received reports of injuries resulting from the defective panoramic sunroofs shattering.

62.    Other manufacturers concur. When Nissan initiated a safety recall for shattering panoramic sunroofs, for example, it acknowledged that drivers "could be injured by falling glass," and that "[i]f the glass panel were to break while the vehicle is in motion, it could cause driver distraction, increasing the risk of a crash."[15] And when Hyundai initiated its recall, it too acknowledged that

---

[15] Jenna Reed, *NISSAN Recalls Certain Beetle Models Over Potential Panoramic Sunroof Issue*, glassBYTEs.com (Dec. 11, 2014), http://www.glassbytes.com/2014/12/Nissan-recalls-certain-beetle-models-over-potential-panoramic-sunroof-issue/; *accessed on December 21, 2016* and
Nissan of America, Inc., *Nissan Issues Voluntary Recall* (Dec. 7, 2014), https://media.Nissan.com/release/856/; *accessed on December 21, 2016.*

the shattering of panoramic sunroofs "relates to motor vehicle safety," including by posing a risk of cutting vehicle occupants.

63.     In connection with the Hyundai recall, the NHTSA wrote that the breaking of the panoramic sunroof could lead "to personal injury or a vehicle crash." In connection with an Audi recall, the NHTSA wrote that "should the sunroof's glass break while the vehicle is in use, the falling glass could cut and injure the driver or passengers [and] could also distract the driver, increasing the risk of a crash."

64.     KATRI likewise concluded that the sudden shattering of a panoramic sunroof while driving may cause "abrasions due to shattered glass" and also cause the "risk of secondary accidents."

65.     In December 2012, KATRI launched an investigation into exploding panoramic sunroofs of numerous automotive manufacturers. KATRI's investigation culminated in November 2013, when it met with numerous car manufacturers in Seoul, South Korea, and announced its finding that the ceramic tint in panoramic sunroofs substantially weakens the glass and compromises the safety of the glass. KATRI recommended widespread recalls.

66.     KATRI's recommendations went unheeded by FCA in launching, distributing, and selling its Jeeps with panoramic sunroofs.

### E.  FCA Refuses to Warn Drivers

67.     Despite the high number of complaints and the danger posed by the defect, FCA continues to conceal its existence from current drivers and potential customers alike. FCA has neither warned consumers at the point of sale/lease nor when drivers who have experienced a shattered sunroof bring their vehicle in for repairs (or instructed its dealerships to do so) making no effort to alert consumers of the risk. FCA knows of the defect yet continues to profit from the sale and lease of vehicles to unwitting consumers.

68.     FCA continues to conceal the defect even though it knows that the defect is not reasonably discoverable by drivers unless they experience a failure and are exposed to the attendant safety risks.

69.     FCA remains silent even as it continues to receive complaints.

70.     As a result of FCA's inaction and silence, consumers are unaware that they purchased or leased a vehicle that has a defective sunroof, and continue to drive these unsafe vehicles. Additionally, drivers who have experienced an exploding sunroof and bring their vehicles to a dealership for repairs are not told that identically defective sunroofs are installed as replacements in their vehicles.

71.     Other manufacturers who have had vehicles with similar panoramic sunroof problems—Audi, Hyundai, and Nissan—have voluntarily initiated safety recalls as a result, notifying drivers of the danger and offering to repair the sunroofs free of cost.

   **F.  FCA's Deceptive Warranty Process**

72.     FCA provides a Basic Limited Warranty with each Class Vehicle at the time of purchase.

## 2. What's Covered Under FCA US LLC's Warranties

### 2.1 Basic Limited Warranty

**A. Who Is Covered?**
You are covered by the Basic Limited Warranty if you are a purchaser for use of the vehicle.

**B. What's Covered**
The Basic Limited Warranty covers the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation. There is no list of covered parts since the only exception are tires and Unwired headphones. You pay nothing for these repairs. These warranty repairs or adjustments — including all parts and labor connected with them — will be made by your dealer at no charge, using new or remanufactured parts. [16]

---

[16] https://www.jeep.com/crossbrand/6.7/warranty/pdf/2016-Jeep-Gas_5_60-Generic_Warranty.pdf (last accessed 1/10/2020).

73.     FCA advertises that it warrants every Jeep vehicle under a "3-year/36,000-mile" basic warranty coverage and offers additional special extended warranty coverage for certain items.[17]

74.     FCA warrants to correct defects in materials, workmanship, and factory preparation on everything in the vehicle except tires and unwired headphones.

75.     FCA explicitly warrants that consumers will "pay nothing" for repairs.

76.     The relevant terms of the warranties for each of the model years of the Class Vehicles are identical or substantially similar.

77.     Plaintiff and Class Members experienced damage from the sunroof defect within the warranty periods of their vehicles.

78.     Plaintiff and Class Members reasonably expected that any and all damage that resulted from the sunroof defect would be covered under the warranty, and that they would not be charged for such repairs.

79.     FCA has systematically denied coverage with respect to the defective sunroofs.

80.     Plaintiff and numerous Class Members have been forced to incur substantial repair bills and other related damages, including being forced to make claims under their automotive insurance policies and incurring substantial deductibles.

81.     FCA's actions are deceptive.

## V.     PLAINTIFF'S EXPERIENCE

82.     Plaintiff Kimberly Sprenger purchased a new 2016 Jeep Cherokee from Joe Machens Jeep Dealership located in Columbia, Missouri after extensive research as to its safety features and options.

---

[17] *Id.*

83.     Ms. Sprenger was willing to and did spend substantial money on a car that she believed was safe and reliable.

84.     Ms. Sprenger's purchased Jeep Cherokee was equipped with a factory-installed panoramic sunroof.

85.     On or about the morning of January 7, 2019, Ms. Sprenger was driving to work at approximately 55 mph on Route M – no other cars were around her, no trucks were in front of her, it was a clear day with low 30 degree weather, no precipitation. Suddenly, Ms. Sprenger heard a loud pop or bang – it sounded like a gunshot. Her ears began ringing. She felt glass fall on her neck and back. Her panoramic sunroof shattered and glass was all over the inside of her vehicle.

86.     Ms. Sprenger was delayed going into work due to this incident and she could not drive the vehicle.

87.     She suffered abrasions on her neck and back due to the glass breakage.

88.     Ms. Sprenger contacted Jeep Customer Care shortly after the explosion to inquire about warranty coverage. She was told that it was a non-warranty issue and no reimbursement would be given.

89.     Ms. Sprenger inquired whether there was a recall on the panoramic sunroofs, the Jeep Customer Care representative informed her that there was not.

90.     Ms. Sprenger further inquired whether other consumers had experienced and reported a similar incident. The Jeep Customer Care representative said there were no reports.

91.     Due to the cost of the repair estimate and that FCA would not cover the damage under warranty, Ms. Sprenger was forced to turn it into insurance and pay a $100 deductible.

92.     Ms. Sprenger was without her vehicle for a week while the sunroof was replaced.

93.     Ms. Sprenger is afraid the replacement sunroof will explode like the original one did. She has lost confidence in the safety of the vehicle as well as in the customer service from FCA through Jeep Customer Care.

94.     Ms. Sprenger is now scared to drive her vehicle. She would prefer not to drive or even own her Class Vehicle anymore.

95.     Had Ms. Sprenger known of the car's panoramic sunroof defect, she would not have purchased her Class Vehicle or would have paid less for it.

96.     Had FCA adequately disclosed the panoramic sunroof defect, Ms. Sprenger would not have purchased the vehicle or she would have paid substantially less for it. In addition, Ms. Sprenger would not have suffered the economic damages she sustained. She did not receive the benefit of the bargain.

## VI.      CLASS ACTION ALLEGATIONS

97.     Pursuant to Fed. R. Civ. P. 23, Plaintiff brings this case as a class action on behalf of herself and all others similarly situated as members of the following proposed Class on the federal and respective state claims as purchasers and lessees of the "Class Vehicles." Class Vehicles include all Jeep vehicles for the 2015 through present model years that are equipped with factory-installed panoramic sunroofs that were purchased in Missouri or by Missouri residents. Plaintiff anticipates amending the Class Vehicles definition upon FCA identifying in discovery all of its vehicles manufactured and sold with the panoramic sunroof feature.

98.     Excluded from the proposed class is FCA; any affiliate, parent, or subsidiary of FCA; any entity in which FCA has a controlling interest; any officer, director, or employee of FCA; any successor or assign of FCA; anyone employed by counsel in this action; any judge to whom this

case is assigned, his or her spouse; and members of the judge's staff; and anyone who purchased a Class Vehicle for the purpose of resale.

99.     Members of the proposed class are readily ascertainable because the class definitions are based upon objective criteria.

100.    **Numerosity**. FCA sold many thousands of Class Vehicles, including a substantial number in Missouri. Members of the proposed Class likely number in the thousands and are thus too numerous to practically join in a single action. Class Members may be notified of the pendency of this action by mail, supplemented by public notice (if deemed necessary or appropriate by the Court).

101.    **Commonality and Predominance**. Common questions of law and fact exist as to all proposed members of the Class and predominate over questions affecting only individual Class Members. These common questions include:

(a)     Whether the panoramic sunroofs in the Class Vehicles are designed defectively such that they have a propensity to spontaneously shatter;

(b)     Whether FCA knew or should have known that its panoramic sunroofs are defectively designed such that they have a propensity to spontaneously shatter, and if so, when it discovered this;

(c)     Whether the knowledge of this propensity to shatter would be important to a reasonable person, for example, because, it poses an unreasonable safety hazard;

(d)     Whether FCA failed to disclose to or concealed from potential consumers: the existence of the sunroofs' propensity to spontaneously shatter;

(e)     Whether FCA breached its express warranty obligations;

(f)     Whether FCA has a pattern and practice of attributing damages claimed by

32

Plaintiff and Class Members to causes other than the complained-of defect;

(g)     Whether FCA should be required to notify Class Members about the panoramic sunroofs' propensity to spontaneously shatter;

(h)     Whether FCA should be required to cease its practice of providing the same or substantially similar replacement sunroofs as the defective sunroofs;

(i)     Whether the Court may enter an injunction requiring FCA to cease its practice of replacing shattered panoramic sunroofs with identically defective replacement sunroofs;

(j)     Whether this Court should grant other declaratory relief requested herein;

(j)     Whether FCA had a duty to disclose to Plaintiff and Class Members the true character, quality, and nature of the Class Vehicles and the sunroof defect;

(k)     Whether FCA's conduct, as alleged herein, violates the Magnuson-Moss Warranty Act ("MMWA"), 15 U.S.C. § 2301, *et seq.*;

(l)     Whether FCA's conduct, as alleged herein, violates the consumer protection laws of Missouri;

(o)     Whether FCA's conduct, as alleged herein, entitles Plaintiff and Class Members to restitution under federal law and the laws of their respective states.

102.    **Typicality**. Plaintiff's claims are typical of the claims of the proposed Class. Plaintiff and the members of the proposed Class all purchased or leased Class Vehicles with panoramic sunroofs that are inherently susceptible to spontaneous shattering, giving rise to substantially the same claims. As illustrated by Class Member complaints, some of which have been excerpted herein, each vehicle model included in the proposed class definitions suffers from the same or substantially similar defect.

103.   **Adequacy**. Plaintiff is an adequate representative of the proposed Class because her interests do not conflict with the interests of the members of the Class she seeks to represent. Plaintiff has retained counsel who are competent and experienced in complex class action litigation, and will prosecute vigorously on Class Members' behalf.

104.   **Superiority**. A class action is superior to other available means for the fair and efficient adjudication of this dispute. The injury suffered by each Class Member, while meaningful on an individual basis, is not of such magnitude as to make the prosecution of individual actions against FCA economically feasible. Even if Class Members themselves could afford such individualized litigation, the court system could not. In addition to the burden and expense of managing many actions arising from the defective panoramic sunroofs, individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases expense to all parties and the court system presented by the legal and factual issues of the case. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

105.   In the alternative, the proposed Class may be certified because:

(a)     the prosecution of separate actions by the individual members of the proposed Class would create a risk of inconsistent adjudications, which could establish incompatible standards of conduct for FCA;

(b)     the prosecution of individual actions could result in adjudications which, as a practical matter, would be dispositive of the interests of non-party class members or which would substantially impair their ability to protect their interests; and

(c)     FCA has acted or refused to act on grounds generally applicable to the proposed Class, thereby making appropriate final and injunctive relief with respect to members of

34

the proposed Class as a whole.

### VII.    TOLLING OF THE STATUTES OF LIMITATIONS

106.    **Discovery Rule**. Plaintiff and Class Members' statutes of limitations accrued upon discovery that the panoramic sunroof installed in their Class Vehicle was defective in that this type of sunroof is manufactured in a way that causes spontaneous shattering, which, in turn, results in costly repairs. While FCA knew and concealed the fact that the panoramic sunroofs installed in the Class Vehicles have a defect that causes spontaneous shattering, Plaintiff and Class Members could not and did not discover this fact through reasonable diligent investigation until after they experienced such spontaneous shattering first-hand. Even then, FCA claims its panoramic sunroofs shatter from other causes and conceals from Plaintiff and Class Members that the sunroofs are defective. Plaintiff and Class Members who experienced exploding sunroofs also could not know that the new sunroofs that were installed in their Class Vehicles presented the same danger of spontaneously shattering.

107.    **Active Concealment Tolling**. Any statutes of limitations are tolled by FCA's knowing and active concealment of the fact that the panoramic sunroofs installed in the Class Vehicles suffered from an inherent defect. FCA kept Plaintiff and Class Members ignorant of vital information essential to the pursuit of their claims, without any fault or lack of diligence on the part of Plaintiff or Class Members. The details of FCA's efforts to conceal its above-described unlawful conduct are in its possession, custody, and control, to the exclusion of Plaintiff and Class Members. Plaintiff and Class Members could not have reasonably discovered the fact that the panoramic sunroofs installed in their Class Vehicles were defective.

108.    **Estoppel**. FCA was and is under a continuous duty to disclose to Plaintiff and Class Members the true character, quality, and nature of the panoramic sunroofs installed in the Class

35

Vehicles. At all relevant times, and continuing to this day, FCA knowingly, affirmatively, and actively misrepresented and concealed the true character, quality, and nature of the panoramic sunroofs installed in the Class Vehicles. The details of FCA's efforts to conceal its above-described unlawful conduct are in its possession, custody, and control, to the exclusion of Plaintiff and Class Members. Plaintiff reasonably relied upon FCA's knowing, affirmative, and/or active concealment and affirmative misrepresentations. Based on the foregoing, FCA is estopped from relying on any statutes of limitation in defense of this action.

109.    **Equitable Tolling**. FCA took active stops to conceal the fact that it wrongfully, improperly, illegally, and repeatedly manufactured, marketed, distributed, sold, and/or leased Class Vehicles with defective panoramic sunroofs. The details of FCA's efforts to conceal its above-described unlawful conduct are in its possession, custody, and control, to the exclusion of Plaintiff and Class Members. When Plaintiff learned about this material information, she exercised due diligence by thoroughly investigating the situation, retaining counsel, and pursuing their claims. FCA fraudulently concealed its above-described wrongful acts. Should such tolling be necessary, therefore, all applicable statutes of limitation are tolled under the doctrine of equitable tolling.

## VIII.    CLAIMS FOR RELIEF

### COUNT I
**Breach of Express Warranty**
**Missouri Ann. Stat. §§ 400.2-313 and 400.2-318**
**(Plaintiff individually and on behalf of the Class)**

110.    Plaintiff re-alleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

111.    FCA's warranties, statements, representations, affirmations, and the like described herein are express warranties under Missouri law.

36

112.    In connection with the sale, purchase or lease, repair, and/or warranty of the Class Vehicles, FCA provided all purchasers and lessees of the Class Vehicles with the express warranties described herein, which became part of the basis of the bargain.

113.    FCA manufactured and distributed the defective panoramic sunroofs in the Class Vehicles which were and are covered by the warranties FCA provided to all purchasers and lessees of the Class Vehicles.

114.    FCA breached these warranties by selling and leasing Class Vehicles with the panoramic sunroof defect, requiring repair or replacement within to occur within the applicable warranty periods despite the unconscionability of the time limits, failing to represent the true nature and quality of the Class Vehicles to consumers and the public, and refusing to honor the warranties with free repairs or replacements during the applicable warranty periods.

115.    FCA further breached these warranties by not correcting the defect. Although FCA warranted that it would correct defects in materials and workmanship in the Class Vehicles, FCA instead replaced shattered sunroofs in the Class Vehicles with identical defective sunroofs and thus failed and continues to fail to correct the defect.

116.    FCA has failed and refused to conform its panoramic sunroofs in the Class Vehicles to the respective express warranties.

117.    FCA's conduct has voided any attempt to disclaim liability for its actions.

118.    The time limits contained in FCA's warranty period were and are also unconscionable and inadequate to protect Plaintiff and Class Members. Among other things, Plaintiff and Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored FCA. A gross disparity in bargaining power exists between FCA and the Class Members, and FCA knew or should have known that the Class Vehicles were defective at

the time of sale and would fail well before the end of the vehicles' useful lives. FCA's superior and exclusive knowledge of the defective nature and true quality of the panoramic sunroofs and the Class Vehicles as well as FCA's acts to conceal the defect from consumers further demonstrates the unconscionability associated with the restrictive warranty period as consumers could not discover the defect and true quality with reasonable diligence unless and until their Class Vehicle's panoramic sunroof spontaneously shattered.

119.    Plaintiff notified FCA of the breach of express warranties within a reasonable time or else she was not required to do so, because affording FCA a reasonable opportunity to cure its breach of written warranty would have been futile.

120.    Plaintiff and Class Members have complied with all obligations under the respective warranties, or otherwise have been excused from performance of those obligations as a result of FCA's conduct described herein.

121.    FCA was and is in actual or constructive privity with Plaintiff and Class Members and/or privity is not required for this claim given that:

> (a) Plaintiff and Class Members had and continue to have sufficient direct dealings with FCA and/or its authorized dealers, franchisees, representatives, and agents to establish any required privity of contract. FCA's authorized dealers, franchisees, representatives, and agents were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles. The warranty agreements were designed for and

intended to benefit only the ultimate purchasers and lessees of the Class Vehicles, *i.e.*, Plaintiff and Class Members.

(b) Privity is not required to assert this claim because Plaintiff and Class Members are intended third-party beneficiaries of contracts between FCA and its dealers, franchisees, representatives, and agents.

(c) By extending express written warranties to end-user purchasers and lessees, FCA brought itself into privity with Plaintiff and Class Members.

122.    As a direct and proximate cause of FCA's breach, Plaintiff and the other Class Members bought or leased Class Vehicles they otherwise would not have, overpaid for their vehicles, did not receive the benefit of their bargain, and suffered a diminution in value of their Class Vehicles. Plaintiff and the Class Members have also incurred and will continue to incur costs for repair and replacement of defective panoramic sunroofs and damage resulting from the spontaneous shattering of such sunroofs.

123.    Accordingly, recovery by Plaintiff and the other Class Members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiff, individually and on behalf of the other Class Members, seek all remedies as allowed by law.

124.    Plaintiff and Class Members are entitled to legal and equitable relief against FCA, including damages, consequential damages, specific performance, attorneys' fees, costs of suit, and such further relief as the Court may deem proper. Plaintiff and the other Class Members have been damaged in an amount to be determined at trial.

## COUNT II
### Breach of the Implied Warranty of Merchantability
### Missouri Ann. Stat. §§ 400.2-314
### (Plaintiff individually and on behalf of the Class)

125.    Plaintiff re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

126.    FCA is and was at all relevant times a merchant, seller, and/or lessor with respect to motor vehicles under the relevant law.

127.    FCA manufactured, sold, promoted, and warranted the Class Vehicles, which FCA placed into the stream of commerce.

128.    The Class Vehicles are and were at all times goods under the relevant law.

129.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used was and is implied.

130.    FCA impliedly warranted and continues to warrant that the Class Vehicles are of merchantable quality and fit for their ordinary purpose.

131.    FCA impliedly warranted and continues to warrant that the Class Vehicles are safe for driving and for using the car for its normal, expected, foreseeable, and intended uses.

132.    Through the conduct described herein, FCA breach the implied warranty of merchantability.

133.    The Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used.

134.    The Class Vehicles all were fitted with defective panoramic sunroofs having the propensity to spontaneously explode.

135.    The panoramic sunroofs installed in the Class Vehicles were defective at the time they left FCA's possession. FCA knew of this defect at the time the purchase and lease transactions occurred. Thus, the sunroofs installed in the Class Vehicles, when sold or leased and at all times

thereafter, were not in merchantable condition or quality because they were and are not fit for their ordinary intended purpose and they do not pass without objection in the trade under the contract description.

136. FCA failed to inform Plaintiff and Class Members of the defective condition of the panoramic sunroofs. The failure to warn Plaintiff and Class Members of this defective condition constitutes a further breach by FCA of the implied warranties of merchantability.

137. Plaintiff and Class Members used the sunroofs installed in the Class Vehicles in a manner consistent with their intended use and performed each and every duty required under the terms of the warranties, except as may have been excused or prevented by the conduct of FCA or by operation of law in light of FCA's unconscionable conduct.

138. FCA had actual knowledge of, and received timely notice regarding, the defect at issue in this litigation and, notwithstanding such notice, failed and refused to offer an effective remedy.

139. In addition, FCA received numerous consumer complaints and other notices from customers advising of the defect associated with the sunroofs installed in the Class Vehicles.

140. FCA's actions breached the implied warranty of merchantability in violation of Missouri law.

141. FCA was and is in actual or constructive privity with Plaintiff and Class Members and/or privity is not required for this claim given that:

> (d) Plaintiff and Class Members had and continue to have sufficient direct dealings with FCA and/or its authorized dealers, franchisees, representatives, and agents to establish any required privity of contract. FCA's authorized dealers, franchisees, representatives, and agents were not intended to

41

be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles. The warranty agreements were designed for and intended to benefit only the ultimate purchasers and lessees of the Class Vehicles, *i.e.*, Plaintiff and Class Members.

(e) Privity is not required to assert this claim because Plaintiff and Class Members are intended third-party beneficiaries of contracts between FCA and its dealers, franchisees, representatives, and agents.

(f) By extending express written warranties to end-user purchasers and lessees, FCA brought itself into privity with Plaintiff and Class Members.

142.    FCA has not validly disclaimed, excluded, or modified the implied warranties or duties described above and required under law, and any attempted disclaimer or exclusion of the implied warranties was and is ineffectual.

143.    By virtue of the conduct described herein, FCA breached the implied warranty of merchantability.

144.    As a direct and proximate result of FCA's breach of warranties, Plaintiff and Class Members suffered economic damage, including loss attributable to the diminished value of their Class Vehicles, loss of use of their Class Vehicles and other tangible property, as well as the monies spent to repair and/or replace their sunroofs.

145. Plaintiff and Class Members are entitled to legal and equitable relief against FCA, including damages, consequential damages, specific performance, attorney fees, costs of suit, and such further relief as the Court may deem proper.

146. As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Plaintiff and Class Members have been damaged in an amount to be proven at trial.

**COUNT III**
**Violation of the Magnuson-Moss Warranty Act ("MMWA")**
**15 U.S.C. § 2301, *et seq*.**
**(Plaintiff individually and on behalf of the Class)**

147. Plaintiff re-alleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

148. The MMWA, 15 U.S.C. §2301(d)(1), provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

149. Plaintiff and Class Members are "consumers" within the meaning of 15 U.S.C. § 2301(3).

150. FCA is a "supplier" and "warrantor" within the meanings of 15 U.S.C. §§ 2301(4)-(5).

151. Class Vehicles are "consumer products" within the meaning of 15 U.S.C. § 2301(1).

152. FCA provided a written warranty for each Class Vehicle and made express representations in advertising, marketing, sale, and post-sale communications.

153. FCA's express warranties are written warranties within the meaning of the MMWA, 15 U.S.C. § 2301(6).

154. The Class Vehicles' implied warranties are covered under 15 U.S.C. §2301(7).

155. FCA breached the warranties as described herein and at least by:

      a.    Extending a 3 year/36,000 mile Basic Warranty with the purchase or lease of the Class Vehicles, thereby warranting to repair or replace any part

defective in material, workmanship, or factory preparation at no cost to the owner or lessee;

b.   Selling and leasing Class Vehicles with panoramic sunroofs that were defective in material, workmanship, and/or factory preparation, requiring repair or replacement within the warranty periods; and

c.   Refusing to honor the express warranties by not repairing or replacing the panoramic sunroofs free of charge.

156.   Plaintiff and Class Members own Class Vehicles that experienced spontaneous panoramic sunroof shattering during the period of warranty coverage or experienced manifestation of the defect outside of the warranty period where the warranty period is unconscionable.

157.   Despite FCA's warranty, FCA does not repair or replace these shattered panoramic sunroofs at no charge to consumers. In fact, FCA has denied claims made under its warranty(ies) by consumers whose Class Vehicle's panoramic sunroofs shattered.

158.   FCA's breach of express warranty(ies) has deprived Plaintiff and Class Members of the benefit of the bargain.

159.   Plaintiff and Class Members have had sufficient dealings with either FCA or its authorized dealers, representatives, and/or agents to establish any required privity of contract. Nonetheless, privity is not required here because Plaintiff and each of the other Class Members are intended third-party beneficiaries of contracts between FCA and its dealers and specifically of FCA's express and implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements with the Class Vehicles. The warranty agreements were designed for and intended to benefit the consumers only.

44

160.    The amount in controversy of Plaintiff's individual claims meets or exceeds the sum or value of $25.00. In addition, the amount in controversy meets or exceeds the sum or value of $50,000.00 (exclusive of interest and costs) computed on the basis of all claims to be determined in this suit.

161.    FCA has been afforded reasonable opportunity to cure its breaches of warranty, including when Plaintiff and Class Members brought his or her vehicle in for repair of the defective panoramic sunroof.

162.    Pursuant to the provisions of 15 U.S.C. § 2310(e), Plaintiff and Class Members have or will all sufficiently notify FCA, thus providing FCA with reasonable opportunity to correct its business practices and cure its breach of warranties under the MMWA. Plaintiff has already sent or will send a MMWA notice letter to FCA.

163.    FCA has not cured the breach of warranty described above and continues to deny warranty coverage when Class Members present their vehicles for repair after their Class Vehicles' panoramic sunroofs spontaneously shattered.

164.    Resorting to any informal dispute settlement procedure or affording FCA another opportunity to cure its breach of warranty is unnecessary and futile. Any remedies available through any informal dispute settlement procedure would be inadequate under the circumstances, as FCA has repeatedly failed to disclose the panoramic sunroof defect or provide repairs at no cost and, therefore, has indicated no desire to participate in such a process at this time. Any requirement under the MMWA or otherwise that Plaintiff or Class Members submit to any informal dispute settlement procedure or otherwise afford FCA a reasonable opportunity to cure its breach of warranty(ies) is excused and/or has been satisfied.

165.    As a direct and proximate result of FCA's warranty(ies) breach, Plaintiff and Class Members sustained damages and other losses to be determined at trial. FCA's conduct damaged Plaintiff and Class Members, who are entitled to recover damages, specific performance, costs, attorneys' fees, and other appropriate relief.

<u>**COUNT IV**</u>
**Violation of the Missouri Merchandising Practices Act ("MMPA")**
**Mo. Rev. Stat. § 407**
**(Plaintiff individually and on behalf of the Class)**

166.    Plaintiff re-alleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

167.    FCA is a "person" within the meaning of the MMPA under § 407.010(5).

168.    The Class Vehicles are "merchandise" within the meaning of the MMPA under § 407.010(4).

169.    The relevant lease and sale transactions between Plaintiff and Class Members and FCA constitute a "sale" within the meaning of the MMPA under §407.010(6).

170.    These transactions are governed by the MMPA.

171.    FCA had a duty to consumers to warn of the known defect of the panoramic sunroofs in the Class Vehicles.

172.    FCA had a duty to consumers to accurately represent the true nature and quality of the Class Vehicles.

173.    FCA failed to fulfill its duties under the MMPA in that it did not warn or inform consumers of the defect prior to, during, or after the sale of their Class Vehicles, FCA actively tried to conceal the defect from consumers, FCA mislead consumers about the nature and quality of the Class Vehicles.

174.    FCA's actions as described herein violate the MMPA.

46

175.    As a direct and proximate cause of FCA's actions – including omissions of material fact, concealment of relevant facts, misleading and deceptive conduct as to the nature and quality of the Class Vehicles, etc. – Plaintiff and Class Members were damaged and the MMPA was violated.

176.    Because FCA's conduct damaged Plaintiff and Class Members, they are entitled to injunctive relief, recover damages – including punitive damages, specific performance, costs, attorneys' fees, declaratory relief, and/or any other relief appropriate under the MMPA.

177.    Plaintiff and Class Members also specifically seek an order enjoining FCA's unfair, unlawful, and/or deceptive practices.

### COUNT V
**Unjust Enrichment**
**(Plaintiff individually and on behalf of the Class)**

178.    Plaintiff re-alleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

179.    As described above, FCA sold Class Vehicles to Plaintiff and Class Members even though the panoramic sunroofs installed in those Class Vehicles were defective and posed a safety hazard. FCA failed to disclose its knowledge of the sunroof defect and the defect's attendant risks-- at the point of sale or otherwise.

180.    FCA unjustly denies warranty coverage for the defect when the panoramic sunroof spontaneously shatters.

181.    FCA unjustly charged and charges Plaintiff and Class Members for repairs and/or replacement of the defective panoramic sunroofs without disclosing that the defect is widespread and that the repairs do not address the root cause of the defect.

182.    As a result of its acts and omissions related to the defective sunroofs, FCA obtained monies that rightfully belong to Plaintiff and Class Members.

183.    FCA appreciated, accepted, and retained the non-gratuitous benefits conferred by Plaintiff and Class Members who, without knowledge of the defect, paid a higher price for their vehicles than those vehicles were worth. FCA also received monies for vehicles that Plaintiff and Class Members would not have otherwise purchased or would have paid significantly less for had they been aware of the defect.

184.    It would be inequitable and unjust for FCA to retain these wrongfully obtained profits.

185.    FCA's retention of these wrongfully-acquired profits would violate fundamental principles of justice, equity, and good conscience.

## IX.    PRAYER FOR RELIEF

Plaintiff on behalf of herself and the Class Members requests that the Court enter a judgment awarding the following relief:

A.    An order certifying the proposed class and appointing Plaintiff's counsel to represent the class;

B.    An order awarding Plaintiff and Class Members their actual damages, punitive damages, and/or any other form of monetary relief provided by law;

C.    An order awarding Plaintiff and Class Members restitution, disgorgement, or other equitable relief as the Court deems proper;

D.    An order requiring FCA to adequately disclose and repair the defective panoramic sunroofs;

E.    An order enjoining FCA's unfair, unlawful, and/or deceptive practices;

F.    An order awarding Plaintiff and Class Members pre-judgment and post-judgment interest as allowed under the law;

48

G.      An order awarding Plaintiff and Class Members reasonable attorneys' fees and

costs of suit, including expert witness fees; and

H.      An order awarding such other and further relief as this Court may deem just and

proper.

## X.      JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury on all issues so triable

under the law.

DATED:  January 13, 2020

                                        Respectfully submitted,

                                        */s/ Jay Barnes*
                                        Jay Barnes [MO 57583]
                                        **SIMMONS HANLY CONROY**
                                        231 S. Bemiston Ave, Ste. 525
                                        St. Louis, MO 63105
                                        Telephone: (314) 259-6700
                                        Facsimile: (618) 259-2251
                                        jaybarnes@simmonsfirm.com

                                        Mitchell M. Breit(*pro hac vice*)
                                        112 Madison Avenue
                                        New York, New York 10016-7416
                                        Telephone:  (212) 784-6400
                                        Facsimile:  (212) 213-5949
                                        mbreit@simmonsfirm.com

                                        Gregory F. Coleman (*pro hac vice*)
                                        Lisa A. White (*pro hac vice*)
                                        **GREG COLEMAN LAW PC**
                                        First Tennessee Plaza
                                        800 S. Gay Street, Suite 1100
                                        Knoxville, TN 37929
                                        Telephone:  (865) 247-0080
                                        Facsimile:  (865) 533-0049
                                        greg@gregcolemanlaw.com
                                        lisa@gregcolemanlaw.com

                                        ***Attorneys for Plaintiff***

49